THE STATE, WAGNER AND OTHERS, PROSECUTORS, v. JACKSON, COLLECTOR OF TAXES OF THE TOWNSHIP OF DELAWARE.

1. By an act of the legislature of the 25th March, 1864, the inhabitants of the township of Jackson, in the county of Hunterdon, were authorized to raise by assessment, on the polls and taxable property in said township, such sum of money as they should in town meeting for that purpose decide to be necessary and proper for the purpose of relieving the inhabitants from the burthen of a draft—not less than 225 voting for the same—the money to be paid out in such manner as the town meeting should direct.

2. At a town meeting held pursuant to the act, it was resolved that the sum of $31,000 should be raised and applied to the payment of the commutation money for the exemption from service, of such persons as should be drafted and accepted for the township of Delaware at the ensuing draft. No provision was made by the town meeting for applying any part of the money thus to be raised for the purchase of substitutes or for paying the men who might be drafted. It was held—
1. That the act of the legislature and the proceedings of the town meeting

held in pursuance thereof are not in conflict with the purpose of the act of congress entitled "an act for enrolling and calling out the national forces and for other purposes," approved March 3d, 1863. That this act provides for raising national forces either by personal service or by procuring an acceptable substitute, or by the payment of a sum not exceeding $300, as the secretary of war might determine, that payment of the commutation was one of the modes contemplated in the law and authorized by it, and that the act of the legislature and the vote of the town meeting, authorizing money to be raised by tax to pay such commutation, was neither unconstitutional nor void.

2. It was not unconstitutional to impose such tax on persons who were not liable to be drafted into service. The tax was for a governmental purpose and for a common benefit, and not to relieve one class of citizens from a burthen and impose it upon another class.

3. The several states can impose taxes and expend the money thus raised in carrying into effect objects entrusted to the general government, which has ample power of its own to fulfil its duties. Such has been the practice from the first adoption of the constitution of the United States.

On *certiorari*. In matter of taxation.

Argued before the CHIEF JUSTICE, and Justices VAN DYE and ELMER, by *A. V. Van Fleet* and *Attorney-General*, for state, and *B. Van Syckel* and *P. D. Vroom*, for defendant.

ELMER, J. The taxes complained of by the prosecutors of this *certiorari* were ordered to be assessed by the vote of a special meeting of the inhabitants of the township of Delaware, in the county of Hunterdon, held May 17th, 1864, by virtue of a special act of the legislature, approved March 25th, 1864. *Acts of* 1864, *p.* 509. This act authorizes the said inhabitants to raise by assessment on the polls and taxable property in said township, such sum as those present and voting at such town meeting should decide to be necessary and proper, not less than 225 voting for the same, for the purpose of relieving the inhabitants of said township from the burthen of a draft; which tax, when collected, was by the said act required to be paid out in such manner as should have been directed by the said town meeting.

A town meeting duly held as prescribed by the act, at

State, Wagner et al. v. Collector of Delaware.

which more than the required number voted, resolved that the sum of thirty-one thousand dollars should be raised, and that the same or such part as should come into the hands of the collector should be applied to the payment of the commutation money for the exemption from the draft of such persons as should be drafted and accepted for the township of Delaware at the ensuing draft, the one now ordered.

It was insisted by the counsel for the prosecutors that this act of the legislature, or if not the act itself the use made of it by the town meeting, was so directly in conflict with the purpose and object of the act of the congress of the United States, entitled " an act for enrolling and calling out the national forces and for other purposes," approved March 3d, 1863, as to render the whole proceedings unconstitutional and void.

By the provisions of this act all the able-bodied citizens of the United States, as well as certain foreigners, except as specially exempted, are required to be enrolled, so that whenever it may be necessary to call out the national forces for military service, the president is authorized to assign to each district the number of men to be furnished. The mode of drafting is prescribed, and the persons drafted are required to be notified to appear at a designated rendezvous to report for duty. Any person drafted may furnish an acceptable substitute, or he may pay to such person as the secretary of war may authorize to receive it, such sum, not exceeding three hundred dollars, as the secretary may determine, for the procuration of such substitute.

It is because the resolution of the town meeting made provision for carrying into effect one of the means for raising national forces, designated by the law of congress, and took no notice of the others, that it was insisted to be so directly in conflict with that law as to be for that reason unconstitutional and void. But there is nothing contained in that law which discloses any preference for one mode of proceeding over the others. Every drafted man reporting for duty is expressly authorized to furnish a substitute or to pay a specified sum to enable the government itself to procure one.

Is the man who does either of the two things left to his option, guilty of opposing or thwarting the object of the law? And if not, is the friend who aids him to do so guilty of any wrong? What the most loyal citizen may innocently do, or what his friends may aid him in doing, certainly cannot become disloyal because it has the sanction of a town meeting or of the legislature.

The great object of the law of congress undoubtedly was to raise men to compose an army, and not to raise money. But it is plainly apparent on the face of the law that congress expected, that besides obtaining men by means of a draft and by placing the drafted men directly in the ranks or by obliging them to procure substitutes, they might also obtain them by requiring every drafted man who preferred such a course to pay a specified sum, to be applied by the government itself in procuring a substitute. It was urged in argument as a sufficient answer to this view of the subject, that if all the drafted men of a district paid the commutation, as seemed to be intended by the resolution objected to, it would follow that no men would be obtained, and the government would be left without a soldier for its protection and the nation surrendered into the power of those who are warring for its destruction. This argument assumes that we are wiser than congress. That body, including the president who approved the law, believed that the sum of three hundred dollars paid by each drafted man unwilling to serve in person, or unable or unwilling to pay more for a substitute, would enable the government itself to procure the needful substitutes; or at all events that it was wiser to do without the soldiers rather than to make the burthen heavier than the people were prepared to bear. Can the legislature or the town meeting be held to have obstructed their action by adopting the same opinion? If it turned out that both were mistaken, it surely cannot be assumed that either was guilty of anything wrong or unconstitutional.

But it by no means follows, as the argument so strenuously urged assumed, that if every drafted man paid the commuta-

State, Wagner et al. v. Collector of Delaware.

tion money the requisite substitutes would not be obtained. The draft fell only upon a portion of those actually enrolled, so that others upon whom it did not fall, or who perchance were not subject to enrollment, large numbers of whom it is well known, were actually received as substitutes, might have been procured; and even those actually drafted might have been willing to serve in the character of substitutes upon receiving the commutation money. If in point of fact it turned out otherwise, it does not follow that the act of congress or the resolution of the town meeting are therefore to be condemned. If the three hundred dollars prescribed in the law failed to produce as many substitutes as were desired, it may have been and probably was occasioned by the substitutes procured in all the loyal states, and in almost every district of those states, by means of the much larger bounties provided for by voluntary contributions of money or by taxes authorized by laws, the constitutionality of which has not been questioned.

The statute book of this state shows that more than one hundred laws were enacted at the same session of our legislature, authorizing various districts to raise money and to incur debts for the payment of bounties to volunteers, who were received by the government as substitutes for the men required to be drafted. And it is a part of the history of our people and much to their honor, that in every state, and in almost every city, county, and township which remains loyal to the government of the Union, large sums of money have been raised and large debts incurred, generally by virtue of special authority from state legislation, for the same praiseworthy object. These proceedings have been universally and justly approved as patriotic and wise; and yet it might be very plausibly insisted, that they were in direct hostility to this and other laws of the United States. They undoubtedly raised the price of substitutes beyond the limit contemplated in those laws, and enlistments in the army and navy were rendered difficult, if not impossible, and they tended to exhaust the resources of the people. It is, indeed,

beyond question that the best means of raising an army, or of arranging the details of a draft or the procurement of volunteers or substitutes, are subjects of very great difficulty, which continue to tax to the utmost the wisdom of the ablest statesmen. What at one time may be deemed the measure best adapted to obtain the men to compose our national forces, at another time and under other circumstances may appear directly to oppose and thwart that all important object. In view of all this uncertainty, it must be a plain and wilful conflict with the measures adopted by the general government, that will justify us in deciding that a tax, in express terms authorized by the state legislature, is unconstitutional, and cannot therefore be collected.

It was also insisted that the money required to be paid by the prosecutors as taxes, was simply money taken from one citizen to pay the debt or duty owed by another, and that such a law is in opposition to the fundamental principles of our state government, and therefore void. The objection, if sound, applies to all those laws before mentioned, authorizing the imposition of taxes to pay bounties to volunteers. Those volunteers were procured after the draft had been ordered, for the purpose of relieving the inhabitants of the districts procuring them, from the burthen about to be imposed on them, and were directly credited to that object. The volunteers were paid heavy bounties to save the men actually drafted or who were liable to be drafted, from being obliged to perform the duty of serving as soldiers or paying for substitutes. Every dollar raised from persons exempt from such a draft, went as directly to pay the debt or duty of the men drafted or liable to be drafted, as did the taxes now complained of.

The constitution of New Jersey vests the legislative power in a senate and general assembly, without undertaking to define in what that power consists; differing essentially in that respect from the constitution of the United States, which, intending to confer not general but only specific, although within their sphere, supreme powers, enumerates what the

powers are, and expressly provides that the powers not delegated to the United States by the consitution nor prohibited by it to the states, are reserved to the states respectively or the people. The power of taxation is beyond a doubt a legislative power, and except so far as it is restrained by the constitution of the United States, is in this state without regulation or limit.

It may be, however, safely admitted, that the power of taking one man's property and vesting it in another, is in no just sense a legislative power; and that a law which attempted to do this under the name of levying taxes would be wholly unauthorized and void. But before a tax expressly authorized by law can be held to be of this character, it must clearly appear that it could not have been intended for any governmental purpose.

Doubts have sometimes been expressed whether the state can impose taxes and expend the money thus raised in carrying into effect objects intrusted to the general government, which has ample powers of its own to fulfill its duties. From the first adoption of the constitution of the United States the practice has been to do this; and the beneficial result of such a practice has never been more conspicuous than upon this recent occasion, when a great rebellion has taxed the utmost powers of all the governments to suppress it. So closely indeed are the separate governments of the states united to the government of the Union, that it is impossible to say when and to what extent, the well-being and prosperity of the citizens of any particular state may greatly depend upon the laws of that state, which are intended to be in aid of the laws of congress. The state is prohibited by the constitution of the United States from keeping troops or ships of war in time of peace; but in a time of war with a foreign nation, or of war produced by a rebellion like that still in progress, the state may maintain an army and engage in the war. As this may be done directly, it may undoubtedly be done indirectly, by military aid to the general government. To a large extent this aid has already been afforded by this as

well as the other loyal states, and must continue to be afforded. This is done in part by imposing taxes to defray the expense of bounties to volunteers and substitutes, and to increase the pay of the national forces, composed of citizens of the state. It is true that every such volunteer might be required to serve without any bounty or even without any pay, and in a certain sense, every citizen owes this duty to the government that protects him. There is however no similarity between a tax raised to take money from one man merely that it may be paid to another, and one raised to compensate a volunteer or a drafted man for performing a duty which might have been exacted of him by a government sufficiently despotic, without compensation.

Bounties to volunteers and pay to soldiers and their families, are certainly legitimate expenses of the government. Whether the bounties were paid directly to the volunteers or substitutes, or to officers authorized to procure them at a price limited by the government, can make no difference. Nor is it needful to inquire what motives may have induced those intrusted with the legislative power to authorize such expenditures. It may have been the belief that volunteers or substitutes would make better soldiers than drafted men ; or it may have been some other motive equally prudent. That motives of a very powerful character were in operation was evinced by the general adoption of the practice, and by the fact that it was approved by the government and by all classes of the people throughout the loyal states. Much doubt as to the propriety of thus interfering was felt at the commencement of the proceedings; but these doubts soon gave way to the urgent necessity of the case, and heavy taxes and heavy debts were incurred, by general consent, for the purpose of relieving the inhabitants of most of the districts, of the burthen of a draft. It is very obvious now, with the knowledge we have of the circumstances attending a draft and the procuring of substitutes, that if the legislature or the town meeting had required a sufficient sum of money to be raised to secure the requisite number of volunteers or

substitutes, whatever might have been the cost, they would have shown more zeal to promote the object in view of raising an army; but a lack of intelligent zeal to promote this object, although quite sufficient to have justified negative votes in the town meeting, is not a sufficient ground for declaring a tax raised in a manner authorized by the law, illegal and void.

Besides these objections there were several other reasons insisted on for setting aside these taxes, in whole or in a part, which remain to be noticed. It was urged that a larger sum was raised than was authorized by the town meeting. Upon referring, however, to the law, it appears that the third section expressly authorizes not only the sum ordered by the meeting to be assessed, but also "the expense incident to the assessing, collecting, and paying out the same." It is not shown that the sum of $776.96, added to the sum ordered by the meeting, was an unreasonable amount for the purposes indicated. The case, therefore, differs essentially from the tax held to be illegal in the case of the *State* v. *Bently*, 3 *Zab.* 532.

Again, it was objected that the sum assessed to the polls was not what the act requires. The language is, that there should be assessed and raised by a poll tax on all married men of fifty cents each, and all unmarried men of one dollar each, on each and every four thousand dollars so assessed on said township, and in the same proportion on all fractions of the said four thousand dollars. In my opinion this language may be fairly interpreted as the assessor evidently understood it, to apply only to the assessment before mentioned in the act, which was to be of the money ordered by the meeting. At all events, the difference between the two modes of calculation affects the assessments upon property in respect to which the objection is made, in so slight a degree, that I do not think we are called on to interfere for this reason.

Another reason was that the assessor testified that he "made no new assessment." It is evident, however, he means only that he did not apply personally to every tax payer in

the usual manner of making a new assessment. This he was not required to do; the act directing him to make this assessment according to the valuation as made at the regular assessment, next before such special town meeting. No evidence has been produced, nor has it been suggested by counsel that any of the prosecutors or others have been assessed for property they do not own, or that any property or polls have been omitted which ought to have been assessed.

It appears, however, that two of the prosecutors, *viz.*, William C. Veghte and Clarkson Hunt, were assessed as single men, although they had become married men before the assessment was made. This, I think, was erroneous, so that the tax imposed on them should be reduced in the sum of three dollars and eighty-eight cents each, and in all other respects the assessment should be affirmed.

CHIEF JUSTICE concurred.

VAN DYKE, J., dissenting. By the 13th section of the act of congress of the 3d March, 1863, for the enrolling and calling out the national forces, it is provided that any person who may be drafted into the service may, instead of going himself, furnish an acceptable substitute to take his place in the draft, or, if he shall not see fit to go into the service himself or to furnish a substitute, he has the privilege of paying to the government in lieu thereof, a sum of money not exceeding three hundred dollars.

In view of one of the drafts that had been ordered by the government, the inhabitants of the township of Delaware, in the county of Hunterdon, obtained an act of the legislature authorizing them to raise money by taxation to relieve the inhabitants of the said township from the burthen of a draft. This act was approved on the 25th day of March, 1864, and it seems to authorize the clerk, when in the opinion of the township committee it shall become necessary, to hold a public town meeting for the purpose specified in the act, to call such meeting by setting up notices, &c.

It is made lawful, also, for the inhabitants of the township at such meeting to raise by assessment on the polls and taxable property, such sum as a majority of those present and voting shall decide to be necessary and proper, for the purpose of relieving the inhabitants from the burthen of a draft, and specifying the mode and manner in which it is to be done. The collector of such taxes is required to pay out the money thus raised, for the purpose of relieving the inhabitants from the burthen of a draft, in such manner as shall have been directed by the said town meeting.

The special town meeting seems to have been called and held, and it ordered and directed that the sum of $31,000 should be raised by assessment and taxation; and it further ordered and directed that the money so to be raised should be applied by the collector to the payment of the commutation money for the exemption from the draft then pending, of such persons as should be drafted and accepted for that township. That is to say, the meeting resolved and directed that if a person should be drafted and was willing to go into the service of the country, the township would give him nothing. If he were willing to furnish an acceptable substitute the township would give him nothing to aid him in so doing, but if he should prefer to do neither, but chose to remain at home and do nothing, the township would pay $300 to enable him to do so.

The assessor added to the sum of $31,000 ordered to be raised, the sum of $776.99 to cover expenses, losses, &c., and assessed the whole amount against the inhabitants of the township, the plaintiffs among the rest. As the quota of that township was 101 men, the amount assessed was $1476.99 more than was necessary to pay the sum of $300 for each man which the township was called on to furnish. To get this assessment set aside is the object of this *certiorari*. Various reasons have been offered in support of this application.

*First.* It is said that this act of the legislature is unconstitutional and void, for the reason that it is in contravention

of the acts of congress on the subject. I am not able to see anything in the act of the legislature itself which can bear such an interpretation. It seems to be very well understood, that the township had no authority to raise money for such a purpose, especially at a special town meeting, without the aid of the legislature for that purpose. The object and intent of the act, so far as we can gather them from its terms, seem to have been to enable the township to relieve such of its citizens as should be the subjects of the draft, from the burthens that such draft would impose upon them. This might have been done, I think, either by offering bounties for volunteers or to such as should go into the service if drafted, or to aid the drafted men in procuring substitutes, or in assisting them to pay their commutation money. It is easy to see how the act of the legislature could have been carried into execution, in a manner greatly to have aided the government in the object which it had in view, which was to raise troops to enable it to suppress the rebellion. I can see nothing in the act which is in conflict with this great object, or that shows any unfaithfulness or disloyalty to the general government; and yet it was quite possible for the township so to use the authority conferred by the act, and perhaps thus did so, as to embarrass rather than to aid the government, without any violation of the letter of the act of congress. Did they do so?

It is insisted that even if the act of the legislature be valid, still that the action of the township under that law made the whole proceeding nugatory, for the reason that it was intended to embarrass, and did, in fact, embarrass rather than aid the government in its military operation. We have already seen that the money to be raised was to be appropriated, according to the directions of the special town meeting; and we have also seen that these directions were to use it in paying the commutation money, as it is called, for the men that should be drafted, and for nothing else. We can only ascertain the *intention* of the township from what it actually did; but whatever that intention may have been, it

seems impossible not to perceive, that the course pursued was the most unfavorable one towards the government that could well have been adopted. And yet I am not able to see, as between the government and the township only, why it could not lawfully do precisely what it undertook to do.

The township, as such, was not bound to do anything to aid the government. Its claim was not upon the township but upon the men of the township. Each man in the township that was or might be drafted, had an undoubted right, according to the act of congress, to pay his commutation money of $300 and to do nothing else. And who can say that the township, if its people had been unanimous on the subject, had not the right to aid their drafted men in doing so. This act of congress was manifestly intended to be as lenient as possible, for it said in substance to drafted and acceptable men, that if they preferred not to go themselves, they might furnish substitutes on such favorable terms as they might arrange for; but to save them from what might possibly have been an extortionate imposition as to price, it further said you need not be compelled to pay for substitutes, in any event, over $300, and if you cannot procure them for that sum, we will take the money and procure the substitutes ourselves. The township saw fit to direct and confine its bounty to this last alternative; and although it seems very much like a premium offered to keep their drafted men at home, still it is an alternative clearly presented by the act of congress, which I think the township, as between it and the government, had the right to adopt.

But had the township the right, even under the authority of the act of the legislature, to adopt this course as against its own unwilling and resisting citizens? Was it not, as to them, a total perversion of the spirit and meaning of that act, and wholly different from what has occurred anywhere else. If the relief contemplated by the act had been extended alike to all their drafted men, whether they went into the service themselves or whether they furnished substitutes, or whether they chose to use the money to commute with the

government, all the money raised, if it were the right sum, would certainly have been used not only in relieving all their drafted men, but also in aiding the government according to the spirit and letter of the act of congress as well as that of the act of the legislature; but we can readily see that if the drafted men had all chosen to accept their lot and go into the service, either from motives of patriotism or from the considerations of compensation otherwise offered, no part of the money raised would have been used. None of the men on whom the burthen of the draft rested would have been relieved, while the object of the act of the legislature which was to relieve the drafted men, would have been wholly frustrated and the money raised for nothing. So if they had furnished substitutes. We have no knowledge of what actually occurred under this assessment, but we are not at liberty to assume that all the men of a township who might be drafted, would be so selfish or unpatriotic as to prefer their own indolence and ease in preference to their country's welfare, or to accept the offered temptation, to be recognized in the community as either sluggards or cowards in the hour of the nation's peril. We are bound, I think, to assume directly to the contrary. For the township then to determine to raise $31,000 for a purpose for which, in the nature of things, it might never be needed, and if needed at all only to a limited extent, and which might only partially relieve the drafted men from the burthen of such draft, was the adoption of a principle neither contemplated nor authorized by the act of the legislature. The object of the act doubtless was to relieve in some way, *all* the men on whom the burthen should fall, whichever course they might, under the act of congress see fit to adopt, but the determination of the township was to relieve only one class, or the class only which should adopt but one of the *alternatives* presented by congress. This I think was wrong, and as it was done, in defiance of the will of a portion of its people, I think they are entitled to be relieved against it. The township had no right to tax its unwilling people to raise this large sum of

money to relieve those on whom the burthen should fall, and then impose on its acceptance an inflexible condition, degrading in itself, one which substantially compelled the township to furnish no men at all, and thus expose it to another draft, from which, by the sending of its proper quota, it would have been relieved.

It is further insisted that this assessment is illegal for the reason that the assessor assessed over $700 more than was ordered by the township meeting. This was for the purpose of meeting the expenses incident to the assessing, collecting, and paying out of the money. The assessor is expressly ordered to do this by the act of the legislature, and I do not see that he was wrong in so doing.

It also appears that the township directed the raising of $700 more than was necessary to pay the commutations of all the men which the township was liable to furnish, and the assessment is alleged to be erroneous for this reason, but this probably arose from not knowing at the time of the meeting the exact number of men that would be needed. If this excess of money had been a very large one, it would seem as if the proceedings ought to be arrested on account of it, but as it was not, and as the quotas which the states, counties, and townships are liable to furnish, shift very much between the ordering and the completion of these drafts, and as the quota for that township, for aught that appears, may have been reduced after the meeting was held, it would be, under the circumstances, I think, enforcing too rigid a rule to require perfect exactness in such a matter.

It further appears from the case, that the assessor made no new assessment against the tax payers and property of the township, as they then existed, by way of raising this money, but simply took and adopted the assessment precisely as it stood and had been made the year before. He seems to have been under the impression that he was required to do so, because, he says, when speaking of certain of the assessments against some of the plaintiffs that he made them so from the fact, that he was to levy this tax from the former

assessment made. In this he was mistaken. He was authorized by the act to adopt the same valuation as that of the year before, but nothing more. In all other respects the assessment was to be made in the same way as the regular annual assessments are made. This he did not do, and, according to his own evidence, made no effort to do, except only by a resort to the former assessment. This, it seems to me, was exceedingly irregular and unlawful, and is a practice which this court should not sustain; for if it was right in this case, I do not see why it would not be right at all times and in all cases. We cannot shut our eyes to the fact that between these two assessments a number of taxable persons had died and others arrived at a taxable age. Some had probably removed from the township and others removed into it. Old corporations may have expired and new ones been organized. Some persons deemed wealthy at the time of the first assessment, may have been in poverty at the time of the second; and others, who may have had no taxable property at the time of the first, may have had a large amount at the time of the second assessment; persons that were single on the one occasion may have been married at the other, and *vice versa*. So, too, assessments that were erroneous on the former occasion, by being either too high or too low, should have been corrected on the latter, if possible; but all these and other important considerations seem to have been overlooked and disregarded. The direction, therefore, contained in the act of the legislature, that the money ordered to be raised should be assessed upon the polls and upon the real and personal property of the tax payers of the township, has not been lawfully complied with.

It appears also as a matter of fact that some of these plaintiffs were assessed as single men who were married men at the time of assessment; and as no provision is made for an appeal, and as no session of the commissioners of appeal seems to have been held, and as no one was apprised by the assessor as to how he was assessed, no mode of correction was furnished. These last named assessments, therefore,

being erroneous, should be set aside or at least corrected. But as the whole assessment was, for the reasons given, as I think, unlawful, it should be set aside so far as the plaintiffs in *certiorari* are concerned.

Assessment affirmed.

REVERSED, 4 *Vroom* 450.